UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| **RONALD HEBERT and** ) | |
| **AIME DENAULT on behalf of** ) | |
| **themselves and others similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 17-cv-10922-DJC** |
| ) | |
| **VANTAGE TRAVEL SERVICE, INC.** ) | |
| **d/b/a VANTAGE DELUXE WORLD** ) | |
| **TRAVEL and VANTAGE ADVENTURES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____ ) | |

**MEMORANDUM OF DECISION**

**September 24, 2021**

I.    **INTRODUCTION**

Plaintiffs Ronald Hebert ("Hebert") and Aime Denault ("Denault"), filed suit, on behalf

of themselves and a class of others similarly situated (collectively, "Plaintiffs"), against

Defendant Vantage Travel Service, Inc. d/b/a Vantage Deluxe World Travel and Vantage

Adventures ("Vantage Travel") alleging breach of contract, breach of the implied covenant of

good faith and fair dealing, unjust enrichment, breach of common law warranties, negligent

misrepresentation and a violation of the Massachusetts Consumer Protection Act, Mass. Gen. L.

c. 93A, §§ 2 and 9 ("Chapter 93A"), related to river cruise travel packages that Plaintiffs

purchased from Vantage Travel.  D. 1-1.  After Vantage Travel moved for summary judgment on

all claims, the Court allowed the motion except for part of Plaintiffs' Chapter 93A claim, specifically whether Vantage Travel violated Massachusetts regulations governing travel services, 940 C.M.R. § 15.06 ("§ 15.06").  D. 147.  Vantage Travel then moved the Court for reconsideration on the remaining Chapter 93A claim and the Court denied the motion, clarifying that violation of § 15.06 constitutes a *per se* unfair or deceptive act or practice, an element of Plaintiffs' Chapter 93A claim.  D. 192 at 3–9.[1]  Accordingly, the matter for which there remained disputed issues for trial concerned whether Vantage Travel violated § 15.06, and if such violation caused an injury to Plaintiffs.  Id. at 4–5, 9.

During a four-day bench trial, which began on July 26, 2021, the Court heard evidence on this remaining issue from witnesses and admitted exhibits proffered by the parties, D. 273; D. 274; D. 276; D. 277,[2] and having considered the parties' proposed findings and conclusions, D. 278-79, now issues its findings of facts and conclusions of law below.

## III.   FINDINGS OF FACT

The Court has already recited certain undisputed facts in this matter in its Memorandum & Order allowing in part Vantage Travel's motion for summary judgment, D. 147, and incorporates those undisputed facts by reference here.  The Court addresses below the remaining facts material to its ruling on the Chapter 93A claim.

### A.     The Parties and Witnesses

1.     Plaintiffs are a class of 168 passengers consisting of:  "[a]ll persons who purchased from Vantage [Travel] either the July 2016 'Majestic Rivers of Europe' tour, or the July 2016 'Highlights of the Danube River.'"  D. 75 at 6.

---

[1] The Court's Memorandum and Order on Vantage Travel's Motion for Reconsideration contains a full recitation of the procedural history in this case.  D. 192.

[2] References to the trial transcripts are to "[Day]:[page]:[line], [witness name]."  References to exhibits admitted at trial are as "Exh. __."

2.      Vantage Travel is a tour operator that sold the two river cruises to Plaintiffs:  the 17-day/16-night Majestic Rivers of Europe tour ("Long Cruise") and the 11-day/10-night Highlights of the Danube tour ("Short Cruise").  Both cruises took place on the same ship, the *MS River Voyager* ("Ship").  Exh. 6; Exh. 7(a); Exh. 8(a).

At the bench trial, the following witnesses testified:

3.      Ella Denault ("Denault") was a passenger on the Majestic Rivers of Europe cruise.  1:31:6, Denault.

4.      Kimberly Train ("Train") is as an expert in the field of economic damages. 1:178:19-25, Train.

5.      Ronald Hebert ("Hebert") was a passenger on the Majestic Rivers of Europe cruise.  2:78:2; 2:81:19, Hebert.

6.      Albert Dore ("Dore") was director of Boston quality and customer concierge at Vantage Travel in July 2016.  2:129:19-20, Dore.

7.      Gary Greenstein ("Greenstein") was vice president and controller at Vantage Travel in July 2016.  2:138:9-16, Greenstein.

8.      Deirdre Dirkman ("Dirkman") was senior director of air services at Vantage Travel in July 2016.  3:14:12-13; 3:15:8, Dirkman.

9.      Roman Cangar ("Cangar") was director of European operations for Vantage Travel in July 2016.  3:87:17, Cangar.

10.     Michael Tousignant ("Tousignant") is an expert in the field of accounting and auditing.  3:151:24-25, Tousignant.

11.     Kimberly Daley ("Daley") is an expert in the travel and tourism industry. 4:47:17, Daley.

12.     Excerpts of the deposition transcript from Suzanne Dutton, now deceased, were also admitted.  3:3:11-16; Exh. 16.

**B.     Ship Malfunction and Cruise Deviations**

13.     All travel services were provided between the cruise beginning on July 8 until July 14, 2016.  Exh. 8(a) at 1-6.[3]

14.     During the morning of July 14, 2016, the Ship's bow thruster malfunctioned, which prevented the Ship from safely sailing any further.  3:92:6-25; 3:93:1-2, Cangar.

15.     The Ship remained docked in Kitzingen, Germany, for four nights, rather than sailing to each city, as scheduled.  While docked, all on-board services were still provided as originally planned.  Exh. 8(a) at 7-13; 3:105:25, 3:106:1, Cangar.

16.     In lieu of transporting Plaintiffs to each city on the Ship, Vantage Travel transported Plaintiffs to each city by motorcoach.  Exh. 4 at 1, 3; Exh. 8(a) at 7-13; 3:106:12-25, Cangar.

17.     Denault testified to the unsatisfactory condition of the motorcoaches, her inability to experience her surroundings from the motorcoaches (as opposed to the deck of the Ship), and her inability to move around during hours-long rides, including the use of on-board restrooms.  1:39-40; 1:39:10-13, 21-22, Denault; Exh. 4.

18.     On July 14, 2016, the Ship did not sail through Althmuhl Valley or pass through the locks of Rhine-Maine-Danube Canal, as the Ship was docked in Kitzingen.  Vantage Travel

---

[3] Exhibit 8(a) is a chart that compares the cruise's originally scheduled itinerary with what was provided, given Vantage Travel's modifications or "deviations."  Vantage Travel prepares these "deviation reports" any time a trip experiences such modifications.  2:167:16-18, Greenstein.  Both Cangar and Hebert testified that the chart accurately represents such deviations.  3:106:15-17; 3:112:24; 3:115:2; 3:124:15; 3:126:25; 3:128:1, 15, 25, Cangar; 2:99:12-13; 2:100:5, 10; 2:102:8, 24; 2:105:23; 2:108:7, Hebert.  Below, the Court describes deviations from the original itinerary (i.e., scheduled but did not occur, or not scheduled but added).  Unless stated otherwise, all other services were provided.

added a shuttle from the pier to Kitzingen Center and bicycles to ride around Kitzingen.  Exh. 8(a) at 7.

19.     On July 15, 2016, Vantage Travel added motorcoaches from Kitzingen to Nuremberg, Germany, as the Ship was docked in Kitzingen and had not sailed overnight to Nuremberg.  The driving time was one hour and forty-five minutes each way.  That day, the Ship did not make an optional stop in Roth, Germany.  Exh. 4 at 1; Exh. 8(a) at 7-8.

20.     On July 16, 2016, Vantage Travel added motorcoach transportation and transfer escort services from Kitzingen to Regensburg, Germany, because the Ship did not sail overnight from Nuremberg/Roth to Kelheim, Germany, as originally planned.  The tour did not go to Kelheim, because the Weltenburg Monastery, for which an optional tour was scheduled, was closed that day.  Passengers that paid for the optional tour were refunded.  Vantage Travel added transportation to Regensburg by motorcoach, which was four hours each way, including a restroom stop.  Vantage Travel added a lunch stipend for passengers to have lunch in Regensburg.  Exh. 4 at 1; Exh. 8(a) at 9-10; 3:112-14, Cangar.

21.     On July 17, 2016, Vantage Travel added a trip to Bamberg, a UNESCO World Heritage Site, which included a walking tour, lunch stipend and transportation by motorcoach, which was one hour and twenty minutes each way.  Exh. 4 at 1; Exh. 8(a) at 10-11; 3:115:3-22, Cangar.

22.     On July 18, 2016, Vantage Travel added motorcoach transportation from Kitzingen to Vienna, Austria, as the Ship had not sailed overnight from Regensburg to Passau, Germany.  The trip from Kitzingen to Vienna took eleven hours, with a stop in Passau.  A 30-minute organ concert at Passau's St. Stephen's Cathedral did not occur, as originally scheduled. Vantage Travel added a lunch stipend in Passau.  Exh. 4 at 1; Exh. 8(a) at 11-12.

23.     Once in Vienna, Plaintiffs spent four nights (from July 18-July 21) at a Vienna Hilton ("Hotel") in lieu of staying on the Ship, which would have been docked in Vienna for two nights but remained in Kitzingen for repairs.  Exh. 8(a) at 12-17; 3:118:8-25, Cangar.

24.     The Hotel was centrally located near the historic city center.  Exh. 8(a); 3:120:15-24, Cangar.

25.     Plaintiffs were provided breakfast and dinner at the Hotel and Vantage Travel added lunch stipends for the days that Plaintiffs were in Vienna.  There was no free iced tea at the Hotel, unlike the Ship.  Exh. 8(a) at 12-17.

26.     Hebert and Denault were not satisfied with the quality of the rooms and service at the Hotel, including the meals served.  1:53-54, Denault; 2:88:10-11, Hebert.

27.     On July 19, 2016, an on-board apple strudel baking demonstration did not occur as scheduled.  Exh. 8(a) at 13.

28.     On July 20, 2016, Vantage Travel added free shuttle service around Vienna.  Exh. 8(a) at 14.

29.     On July 21, 2016, Vantage Travel added motorcoaches between Vienna and Budapest because the ship did not sail from Vienna to Budapest, as originally scheduled.  Some Plaintiffs chose to stay in Vienna, and Vantage Travel added a lunch stipend for those Plaintiffs. Vantage Travel added a lunch stipend for Plaintiffs that traveled to Budapest and chose to have lunch on their own.  Vantage Travel also added a lunch option at the Duna Palace in Budapest. Exh. 8(a) at 16; 3:128:2-11, Cangar.

30.     The Ship was repaired and returned to Vienna on July 21, 2016, which sailed Plaintiffs overnight to Budapest for the final day of the cruise.  Exh. 8(a) at 16-17; 3:128:2-11, Cangar.

### C.  Trip Costs and Compensation Offers

31.     Vantage Travel received $944,399 in cash from Plaintiffs for the two trips.[4] 2:146:12-21, Greenstein; 3:162:1-2, Tousignant.

32.     Vantage Travel offered passengers a future trip credit ("FTC") to use with Vantage Travel, first for $250, then for $500.  1:80:7-8, Denault; 2:89:11-13; 124:16-18, Hebert; 3:140:5-11, Cangar; Exh. 5.

33.     Sixty-five passengers accepted and used the $500 FTC.  Exh. 13; 3:169:22-24, Tousignant.

34.     Vantage Travel also offered passengers a complimentary cruise around either Thanksgiving or Christmas of that year.  1:80:8-9, Denault; Exh. 2(a) at 2.

35.     Sixty-four passengers accepted a free cruise.  Exh. 13; 2:172:24, Greenstein.

## IV.   **CONCLUSIONS OF LAW**

The Court has already made certain conclusions of law in this matter in its Memorandum & Order allowing Vantage Travel's motion for summary judgment in part, D. 147, and denying Vantage Travel's motion for reconsideration, D. 192, and incorporates those conclusions by reference here.

In light of the evidence presented at trial, the Court makes the following conclusions of law:

---

[4] The $944,399 figure represents net cash, or the amount of cash received by Vantage Travel for the two cruises.  2:146:12-21, Greenstein; 3:162:1-2, Tousignant.  Train, Plaintiffs' expert, relied upon a higher number, $1,136,310, listed in a declaration filed with Vantage Travel's Notice of Removal.  See Exh. 6.  Tousignant explained that the higher number may represent the gross retail price of the tour, prior to pricing adjustments and loyalty discounts, but that actual cash received by Vantage Travel for the two cruises, as shown in the company's general ledger, was $944,399.  3:162:1-2; 3:184:13-14, Tousignant.

### A. Demand Letters

1.      Chapter 93A contains a pre-suit demand letter requirement "to encourage negotiation and settlement by notifying prospective defendants of claims arising from allegedly unlawful conduct . . .  [and] to operate as a control on the amount of damages which the complainant can ultimately recover if he proves his case."  Casavant v. Norwegian Cruise Line Ltd., 460 Mass. 500, 505 (2011) (citations omitted).[5]

2.      A Chapter 93A demand letter does not need to "set forth every specific statutory or regulatory violation alleged, so long as it fairly notifies the prospective respondent of the actions or practices of the respondent and the injury suffered by those actions."  Id. at 506.  Although a letter need not describe the legal basis for the claim, it must specifically describe the deceptive practices alleged.  Id. (citing Clegg v. Butler, 424 Mass. 413, 423, (1997)).  Relief "on actions not so mentioned [in the demand letters] is foreclosed as a matter of law." Passatempo v. McMenimen, 461 Mass. 279, 300 (2012).

3.      Here, the sole remaining unfair or deceptive act pressed by Plaintiffs is violation of § 15.06 (i.e., failure to offer the three options).  Plaintiffs' demand letters do not mention such failure, nor do they fairly reference the options themselves, save for a cash refund.  See Exh. 1(a)-1(d).  Plaintiffs' letters assert that Vantage Travel's failure "to provide cash refunds" was unfair, e.g., Exh. 1(a) at 2; the basis of Plaintiffs' present Chapter 93A claim, however, relies upon the failure to offer three options enumerated in the Regulation, only one of which is a cash

---

[5] Vantage Travel brought a belated challenge to the sufficiency of Plaintiffs' Chapter 93A demand letters, waiting until two days before the final pretrial conference to argue same in a motion for summary judgment.  See D. 248.  The Court denied the motion without prejudice given such timing.  D. 252.

refund.[6]  Moreover, the options identified in § 15.06 go beyond a mere refund.  For example, option two would require Vantage Travel to "provide a specifically identified substitution travel service of equal or greater fair market retail value."  940 C.M.R. § 15.06(2).  In other words, mentioning only a refund did not fairly apprise Vantage Travel that it also allegedly failed to offer a specifically identified substitution travel service of greater fair market retail value.  Finally, Plaintiffs' demand letters specifically reference other putative regulatory violations as deceptive acts, see Exh. 1(a) at 2 (citing 940 C.M.R. § 15.04), indicating that Plaintiffs were aware of the travel services regulations generally but nevertheless failed to reference § 15.06 or its substance.

4.    Accordingly, the Court concludes that Plaintiffs' demand letters do not sufficiently describe the unfair or deceptive act that underlies their Chapter 93A claim.  Although this basis alone is grounds for rejecting the remaining Chapter 93A claim, Passatempo, 461 Mass. at 300, in the interest of completeness and given the record at the bench trial, the Court considers the merits of the Chapter 93A claim.

---

[6] In Casavant, the Supreme Judicial Court rejected defendant's challenge to the sufficiency of Chapter 93A demand letters because, although the plaintiffs' letters did not reference the specific regulatory violation complained of, the substantive allegations in the letter fairly described the injury suffered (failure to obtain a refund), which encompassed the specific deceptive act (failure to disclose refund policy and allow plaintiff to seek a refund).  Casavant, 460 Mass. at 506.  In reaching this conclusion, the court highlighted defendant's response to the demand letters that "it had a refund policy with which the [plaintiffs] had not complied, but which [defendant] knew had not been disclosed, [thus it] was or should have been aware of its obligation to provide the [plaintiffs] with a refund."  Id.

### B.  Chapter 93A Claim

5.     In light of the Court's prior rulings, the sole remaining theory of Chapter 93A liability is that Vantage Travel violated 940 C.M.R. § 15.06 ("Regulation"),[7] which in turn constitutes a *per se* unfair or deceptive act or practice.  D. 147 at 27; D. 192 at 9.  Assuming such violation, Plaintiffs must also prove that it caused them a "separate, identifiable harm arising from the violation itself."  D. 192 at 4–5 (quoting Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013)).

### C.  Violation of § 15.06

6.     As a preliminary matter, it is undisputed that Vantage Travel was a "seller of travel services . . . acting as a tour operator" and that Vantage Travel did not offer the three options outlined in § 15.06.  D. 147 at 25–26.  The sole remaining factual issue to be determined at trial was whether Vantage Travel failed to "provide any of the travel services" that Plaintiffs purchased.  See id.

7.     Under § 15.06, when a tour operator "fails" to provide "any" purchased travel services, it "must" offer the three options outlined in § 15.06.  See 940 C.M.R. § 15.06.

8.     As described below, the evidence at trial established that Vantage Travel failed to provide certain travel services that Plaintiffs purchased.

---

[7] In relevant part, § 15.06 requires that when a "seller of travel services . . .  acting as a tour operator . . . fails to provide any of the travel services that a consumer has purchased directly or indirectly from the seller, the seller must offer the consumer the following three options, and must honor the consumer's choice:  (1) the seller will refund to the consumer in cash an amount equal to the fair market retail value of any undelivered, purchased travel service . . . (2) the seller will provide a specifically identified substitution travel service of equal or greater fair market retail value for any undelivered, purchased travel service, at no additional cost to the consumer; or (3) the seller will provide a specifically identified substitute travel service of lower fair market retail value for any undelivered, purchased travel service, and refund to the consumer in cash an amount equal to the difference in the fair market retail prices of the purchased and the substitute travel services."  940 C.M.R. § 15.06.

9.      Vantage Travel failed to provide expected transportation.[8]  Plaintiffs purchased a cruise from Vantage Travel that would transport them each day, from one stop to the next, on the Ship.  Cruising on the Ship, however, did not occur from July 14, 2016, when the bow thruster malfunctioned, until July 22, 2016, when the repaired ship returned to Vienna.  On certain days, cruising through areas like the Rhine-Main-Danube Canal, "one of Europe's greatest engineering feats," the "lovely Altmuhl valley" and the "scenic Wachau Valley" was the activity or experience itself, which did not occur because the Ship was docked in Kitzingen.  Exh. 7(a); Exh. 8(a).

10.      Vantage Travel failed to provide certain scheduled activities.  Plaintiffs did not visit Kelheim or the Weltenberg Monastery (where an optional tour was scheduled), did not attend an organ concert at the St. Stephen's Cathedral in Passau and did not experience an apple strudel baking demonstration on board.  Exh. 7(a); Exh. 8(a).

11.      Although the Court concludes that Vantage Travel violated § 15.06, Plaintiffs must still prove the other elements of the Chapter 93A claim.  D. 192 at 4.

---

[8] The Court admitted two versions of Vantage Travel's Tour Participation Agreement ("TPA"), Exhs. 17–18, one of which contained language ("Modification Provision") that Vantage Travel "reserve[s] the right to modify tour itineraries and substitute hotels and accommodations without liability to Vantage. . . . If a vessel is not able to complete the scheduled itinerary due to low water, high water, mechanical breakdown, or other reason, [Vantage Travel] reserve[s] the right to modify the itinerary, which right shall include the use of hotels and motor coaches where necessary." Exh. 17 at 3.  The other TPA did not contain such language.  See Exh. 18.  The record contains conflicting accounts about which TPA was in effect at the time of the cruises and is devoid of evidence when most Plaintiffs made their reservations (i.e., when they agreed to the applicable TPA).  For example, the Agreement that does not contain the Modification Provision states that it was "effective as of 3/13/2015."  The other Agreement does not contain any effective date.  Greenstein recalled the Modification Provision being in effect when he started working at Vantage Travel in 2015.  2:162:18-25–2:163:1-13, Greenstein.  Dirkman, however, identified the Agreement without the Modification Provision as being in effect for these two tours.  3:18:9-24, Dirkman.  Given the state of the record, the Court does not rely upon the Modification Provision in its analysis.

### D.  Injury

12.     As discussed above, even with a violation of § 15.06, Plaintiffs still must prove that they "suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself," to prevail on their Chapter 93A claim.  Tyler, 464 Mass. at 503.  In other words, violation of § 15.06, standing alone, is not an injury.  See id.; Hershenow v. Enter. Rent-A-Car Co. Of Bos., Inc., 445 Mass. 790, 801 (2006).

13.     The Court accepts the general methodology articulated by Plaintiffs' expert, Train, for calculating injury, which she quantified by deducting the fair market retail value of the delivered travel service from the fair market retail value of the purchased travel service to estimate a fair market retail value of any undelivered travel services.   Train based her equation upon the framework of § 15.06, calculating loss in terms of the fair market retail value of the services delivered and undelivered, not Plaintiffs' subjective preferences or expectations of same.[9]  1:183:22-25; 1:184:1-2; 1:188:13-25; 1:189:1-12 Train; see D. 147 (allowing summary judgment for Vantage Travel on Plaintiffs' contract claims); cf. Salvas v. Wal–Mart Stores, Inc., 452 Mass. 337, 374 (2008) (explaining that contract damages are based upon injured party's expectation interest).

---

[9] To the extent Plaintiffs sought recovery for alleged emotional distress, the Court has already concluded that there was not sufficient evidence for such claim under Chapter 93A.  3:84:1-4; Young v. Wells Fargo Bank, N.A., 109 F. Supp. 3d 387, 396 (D. Mass. 2015), aff'd, 828 F.3d 26 (1st Cir. 2016) (citing Haddad v. Gonzalez, 410 Mass. 855 (1991)) (explaining that a plaintiff "must prove all the elements of intentional infliction of emotional distress in order to prevail on a 93A claim for emotional damages").

14.     As the Court found above, the fair market retail value of the two trips (i.e., the purchased travel services) was $944,399 from the class of 168 Plaintiffs.[10]  2:146:12-21, Greenstein; 3:162:1-2, Tousignant.

15.     Certain travel services were delivered and not affected by the bow thruster malfunction, including optional tours, airfare, trip extensions, travel protection, port charges and transfers, which total $389,160.00.  2:27:16-25; 2:28:1-3, Train.

16.     Up until July 14, 2016, and after July 21, 2016, there was no deviation from the itinerary.  Exh. 8(a).  Train assigned a base tour value to the days before and after the Ship was inoperable (i.e., before July 14 and after July 21), totaling $264,377.  1:192:22-25; 1:193:1-5, Train; 2:30:6-13, Train.

17.     Train, however, assigned no base tour value for any travel days while the Ship did not sail (i.e., July 14-July 21).  1:192:22-15; 1:193:1-5, Train.  Train then added back in the value of certain substitute travel services provided, like the 4-night Hotel stay from July 18-21,[11] and certain meals and other add-ons.  2:50:1-9, Train.  Train did not credit any motor coach transportation while the Ship was docked and excluded certain other meals, like lunch stipends on July 16, 19 and 20.  2:35:15-16; 2:44:10-18, Train.  On all these days, however,

---

[10] The Court notes that two passengers left prior to the bow thruster malfunction and therefore did not receive (nor did Vantage Travel pay for) any substitute travel services for these two individuals.  See 3:43:4-15, Dirkman; Exh. 4.  Because Train's analysis was based upon 168 class members, and the Court does not believe removing the two passengers changes the outcome of its analysis, the Court proceeds with 168 class members.

[11] Plaintiffs were originally scheduled to be docked in Vienna for two nights, but instead stayed in the Hotel, and thus those two nights should not have been excluded as undelivered "cruising nights" in the analysis.  Vantage Travel's calculations, however, add these two nights back into the percentage of delivered base tour costs (i.e., that 10 out of 16 nights were delivered), although Train indeed credited Vantage Travel for the cost of the four nights at the Hotel. Vantage Travel then added back in the four nights Plaintiffs spent on the Ship while docked. This would double-count two of the nights.  Exh. 8(a); 2:30:14-25; 2:31:1-8, Train.

13

Plaintiffs received value for delivered travel services, including accommodations, meals, and other tour activities, whether previously scheduled or substituted during the trip by Vantage Travel. The Court concludes that all substitute travel services, including motor coach transportation, must be credited to Vantage Travel as it was delivered to Plaintiffs and has a fair market retail value that Vantage Travel paid. In other words, Train's decision not to count certain delivered travel services because Plaintiffs expected something different does not comport with the proffered methodology of calculating loss to the class. 2:30:2-13, Train; Exh. 9.

18.     As to accommodations, on July 14, 15, 16 and 17, Plaintiffs stayed on the Ship. Even though it was docked, Plaintiffs received all other on-board services and amenities. Exh. 8(a); 3:105:25-3:106:11, Cangar. Train did not credit such delivered costs. 2:54:2-5, Train. The Court concludes that these are also delivered travel services with a fair market value that Vantage Travel paid.

19.     The total cost of delivered travel services, either scheduled or substituted, between July 14 and July 21 (i.e., the days that Train excluded altogether in her analysis) is $277,858. [12] Exh. 9; Exh. 14; Exh. 15.

20.     The class also accepted and used $32,500 in FTCs and $159,719 in free trips from Vantage Travel. Exh. 13; 3:166:23-24, Tousignant. The Court concludes that these are travel services delivered to Plaintiffs and must be considered as to class wide injury.

21.     The Court summarizes these conclusions in the table below:

---

[12] This figure represents the actual cost of services provided by Vantage Travel for July 14-21, as represented in Exh. 9. 2:161:2-4, Greenstein; 3:38:22-24, Dirkman. The Court excluded from the total on Exh. 9 (€285,438) the total cost of services provided on July 22 and 23 (€33,448) as Train included these days in her initial calculation of the uninterrupted base tour. Exh. 9 at 5-7; ¶ 16, *supra*. The Court then converted the total (€251,989) into dollars, using the exchange rate relied upon by both parties, 1.10266, see, e.g., Exh. 9 at 7, for a total of $277,858.

| Category | Value (in dollars) |
|---|---|
| Net cash of trips (¶ 14) | 944,399 |
| Unaffected services (¶15) | -389,160 |
| Days pre/post Ship malfunction (¶ 16) | -264,377 |
| Delivered services July 14-21 (¶19) | -277,858 |
| FTCs and Free Trips (¶ 20) | -192,219 |
| **Total:** | **-179,215** |

22.     Accordingly, Plaintiffs have not shown economic injury that is separate and distinct from the violation of § 15.06.  Tyler, 464 Mass. at 503; Hershenow, 445 Mass. at 801–02.  The Court does not doubt the disappointment of Plaintiffs in not cruising according to the original itinerary, or their frustration with the changed circumstances of the Ship not being able to sail because of the bow thruster malfunction.  Such an injury, however, is not legally cognizable for recovery under Chapter 93A, particularly in light of Vantage Travel's efforts, which conferred value upon Plaintiffs, to modify the trip in real-time so that it could move forward.  See Shaulis v. Nordstrom, Inc., 865 F.3d 1, 11 (1st Cir. 2017) (explaining that Chapter 93A injury cannot be shown as "disappointed expectations of value in place . . . of real economic loss").

### E. Causation and Damages

23.     Relatedly, Plaintiffs also cannot show causation because the violation of § 15.06 did not cause them any injury, as discussed above.  See Bellermann, 470 Mass. at 53–54; Casavant, 460 Mass. at 503.

24.     Having found no Chapter 93A liability, the Court need not reach the issue of damages (including treble or statutory damages) or attorney's fees.  See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 427 (2005); Rass Corp. v. Travelers Companies, Inc., 90 Mass. App. Ct. 643, 657 (2016); Karaa v. Kuk Yim, 86 Mass. App. Ct. 714, 725 (2014).

## V.   <u>CONCLUSION</u>

After consideration of the evidence presented at trial and in light of the aforementioned findings of fact and conclusions of law, and in light of the earlier Memorandum and Order on the other claims, D. 147, this Court will enter judgment in favor of Vantage Travel.

        **So Ordered.**

                                    /s/ Denise J.  Casper
                                    United States District Judge